IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
POTOMAC NAVIGATION, INC.        *
                                *
v.                              *
                                *    Civil Action No. WMN-09-217
U.S. MARITIME ADMINISTRATION    *
                                *
  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

POTOMAC NAVIGATION, INC.        *
                                *
v.                              *
                                *    Civil Action No. WMN-09-218
UNITED STATES ENVIRONMENTAL     *
PROTECTION AGENCY               *
                                *
  *   *   *   *   *   *   *   *   *   *   *   *   *   *   *
```

**MEMORANDUM**

Before the Court in these parallel actions are Defendants' "Motion[s] to Dismiss Because Matter is Moot," Paper Nos. 9 (both cases), and motions for summary judgment, Paper No. 19 (in Civil Action No. WMN-09-217) and Paper No. 18 (in Civil Action No. WMN-09-218). All motions are fully briefed. Upon review of the pleadings and the applicable case law the Court determines that no hearing is necessary (Local Rule 105.6) and that all of the motions will be denied.

Plaintiff Potomac Navigation, Inc. (Potomac) filed these actions pursuant to the Freedom of Information Act, 5 U.S.C. § 552 (FOIA), complaining that the United States Maritime Administration (MARAD) and the United States Environmental

Protection Agency (EPA) failed to properly respond to its request for documents concerning the preparation and towing of the LIBERTY SHIP ARTHUR M. HUDDELL (the HUDDELL) from the James River Reserve Fleet to Greece.  On April 10, 2009, Defendants filed the motions to dismiss these actions as moot based upon Defendants' production of documents during the pendency of these actions.  Potomac opposed the motions, arguing that Defendants' responses to Potomac's FOIA requests were still incomplete.  Potomac also argued that, even if the Court were to find that Defendants' productions were now complete, these FOIA actions would not be moot as Potomac's request for attorneys fees and costs would still be in need of resolution.

As part of their reply memoranda, Defendants also included requests for the entry of summary judgment in their favor and submitted new affidavit testimony and argument.  Protesting the inclusion of new evidence and argument in reply memoranda, Potomac filed additional pleadings in the nature of either surreplys or, should the Court deem Defendants' pleadings as properly raising motions for summary judgment, oppositions to those summary judgment motions.  Defendants then submitted an additional round of pleadings, captioned as "Response(s) to Plaintiff's Sur-Reply(s)."

In these collective pleadings, the parties agree, for the most part, on the legal standard applicable to a motion to dismiss or a motion for summary judgment in a FOIA action. Courts should dismiss a FOIA action where the agency "demonstrated that it did not withhold any records responsive to plaintiff's FOIA request."  MARAD's Response to Surreply at 5 (citing Caracciolo v. U.S. Merit Sys. Prot. Bd., No. 07-3487, 2008 WL 2622826, at *2 (S.D.N.Y. July 3, 2008)).  Courts grant summary judgment in favor of responding agencies "when all requested records either did not exist or were fully disclosed." Id. at 6 (citing D'Angelica v. IRS, No. S-94-1998, 1996 U.S. Dist. LEXIS 6681, at *3 (E.D. Cal. Apr. 25, 1996)). Furthermore, "[d]iscovery is generally not available in a FOIA case where the agency declarations are reasonably detailed, submitted in good faith, and the court is satisfied that no factual dispute remains."  Id. at 7 (citing Carney v. DOJ, 19 F.3d 807, 812 (2d Cir. 1994)).

As these standards reflect, Defendants' entitlement to either dismissal of the FOIA actions or the entry of summary judgment in their favor must be premised upon a showing that a reasonable search for responsive documents was conducted.  The Court finds that Defendants have yet to make such a showing. The Court will review the record of the production by each Defendant separately.

3

<u>The Production by MARAD</u>

Potomac submitted its FOIA request to MARAD on August 18, 2008, seeking all records and documents concerning the preparation and towing of the HUDDELL from the James River Reserve Fleet to Greece and relating to:

> 1) compliance with and/or the applicability of the Toxic Substance Control Act (TSCA) and the HUDDELL;
>
> 2) the presence of PCBs onboard the HUDDELL;
>
> 3) TSCA exemptions and the HUDDELL;
>
> 4) any TSCA related inspection of the HUDDELL; and
>
> 5) all coordination and consultation with the EPA concerning the preparation and towing of the HUDDELL.

Under 5 U.S.C. § 552(a)(6)(A)(i), MARAD's response to Potomac's request was due on or before September 17, 2008.  After receiving no response, Potomac wrote to MARAD on October 28, 2008, and requested an update.  Christine Gurland, a MARAD FOIA officer, responded on October 30, 2008, and stated that MARAD was working on the request but "some requests take longer than others."  Daniel Fitzgerald Aff., Ex. 1.

On November 19, 2008, Potomac again wrote to MARAD requesting a response.  MARAD did not respond to this inquiry. Potomac then filed the instant suit on February 2, 2009.

Several weeks after Potomac filed this FOIA suit, on March 20, 2009, Gurland, on behalf of MARAD, sent Potomac about one

4

thousand pages of documents that it asserted were responsive to issues 1, 2, and 4, listed above.  She also indicated that MARAD had no documents in its possession responsive to issues 3 or 5.  The documents produced were actually not MARAD documents, however, but were test results from the independent contractor, Universal Laboratories (UL), that sampled for PCBs onboard the HUDDELL.  These test results confirmed that there were clearly regulated amounts of PCBs on the HUDDELL.  It was on the basis of this production of documents that MARAD argued that Potomac's FOIA action against MARAD was now moot.

In opposing the motion, Potomac noted that this partial production by MARAD, coupled with a partial production of documents by EPA, discussed below, actually raised more questions than it answered.  The documents show that the HUDDELL had a PCB problem that, under TSCA, would have required either remediation or a waiver before the vessel could be exported.  According to Potomac, it is clear that MARAD personnel were in attendance during the survey of the vessel and also had discussions with EPA personnel over whether to remove the PCBs or to apply to the EPA for a waiver before transferring the vessel to Greece.  And yet, no MARAD documents concerning any of these issues were produced.

These rather specific challenges to the sufficiency of MARAD's production were largely ignored in MARAD's Reply/Motion

5

for Summary Judgment.  MARAD supported this pleading with a new declaration from Gurland, but the entire discussion of MARAD's search for documents consisted of just two paragraphs.  The first paragraph merely related that the request was forwarded to the Office of the Associate Administrator for National Security, which is the office generally responsible for the disposal of obsolete Government vessels within the Maritime Administration's custody.  Gurland Dec. ¶ d.  The second paragraph related that during the search, "it was discovered that responsive documents might also be located in offices under the jurisdiction of the Maritime Administration's Associate Administrator for Environment and Compliance."  Id. ¶ e.  The request was made that the Office of Environment search for responsive documents and "[d]ocuments were indeed later located [in that office]."  Id.  The remainder of Gurland's declaration is simply a description of the legal review process to which the documents that were found were subjected and the reasons for the delay in production.  The new declaration gives no additional insight into how the search for documents was conducted.

Interestingly, Gurland attached to her declaration a "Certificate of Transfer & Agreement" for the HUDDELL dated June 30, 2008, and a "Delivery and Acceptance Certificate" for the HUDDELL dated July 28, 2008.  Gurland Decl., Ex. G.  Gurland referenced these document to justify the higher level of legal

6

review MARAD's production required, but never explains why these documents were not previously produced in response to the FOIA request. The Certificate of Transfer and Agreement contained provisions that the recipient of the vessel would remove at its own expense the PCBs on the vessel to allow its export and in so doing, would comply with all requirements of the EPA and all federal, state, and local laws. Id., Art. II (a)(iii) & (iv). The Certificate specifically required that the recipient of the vessel comply with TSCA. Id., Art. III (c)(1). Thus, these documents were clearly responsive to MARAD's FOIA request and yet were not produced until after this suit was filed.

Potomac's "surreply" repeats its specific concerns about the continued deficiencies in MARAD's production:

> . . . The overwhelming majority of the pages produced were the raw analysis of samples taken, which confirmed the presence of PCBs in regulated quantities. It is therefore indisputable that the HUDDELL contained regulated concentrations of PCBs and that MarAd was responsible for preparing the HUDDELL for transfer to Greece. Despite this, MarAd failed to produce a single document prepared and/or received by it concerning the removal and/or preparation of PCBs from the HUDDELL, or any document evidencing a decision not to remove PCBs from the HUDDELL. Also curiously absent are any communications between MarAd and any other agency, or between MarAd and Greece communicating the presence of PCBs in regulated quantities on HUDDELL.
>
> What is immediately apparent is the lack of any documents prepared by MarAd itself as the only disclosed documents were produced by UL. For reasons unknown, MarAd fails to produce any MarAd communications or records concerning the extensive

7

>    sampling carried out on board the HUDDELL, at its
>    request.  In fact, MarAd does not even produce the
>    relevant agreement and/or contract entered into with
>    UL to carry out the requested sampling.

MARAD's Surreply at 16-17; see also id. at 6-7 (noting that there should be documents which evidence agency decisions leading to the testing of the HUDDELL for PCBs, the selection of the contractor to do the testing, and agency decisions regarding what should be done about PCBs on the HUDDELL, inter alia).  The surreply also specifically questions why the Certificate of Transfer was not previously produced.

MARAD's response to the surreply largely ignores all of these issues.  The pleading begins with a "Recapitulation of Facts" that simply repeats the contents of Gurland's Declaration without offering any further explanation.  The pleading continues with several pages of case citations, but little discussion of the facts in this action.  For example, under the heading declaring, "The Search for Records was Reasonable," MARAD includes about fifty lines of text setting out the legal standard for what is required to prevail in a FOIA action.  The only sentence under this heading addressing the specific facts of this case, however, is the bald conclusive assertion, "[t]he declarations provided by MARAD have been submitted in good faith and therefore met the applicable standard."  Resp. to Surreply at 9.

8

In the portion of the pleading in which MARAD argues that it is entitled to summary judgment, it declares that "[a]ll questions raised by Plaintiff[] as demonstrating issues of material fact have been answered by Defendant." Id. at 4.  The only example of an answer that it has provided to Potomac, however, is an explanation as to why it did not provide a Vaughn index[1] with its production, id. at 4, which is an answer to a question Potomac never raised.  Potomac never asserted that MARAD should have provided a Vaughn index.  The Vaughn index was simply mentioned by Potomac in the course of distinguishing some of the cases relied upon by MARAD.  See Surreply at 14.

The Production by EPA

While perhaps not to the same extent, EPA's response to Potomac's FOIA request shares with MARAD's many of the same deficiencies.

Potomac submitted its FOIA request to the EPA on August 22, 2008, and accordingly, EPA's response was due on September 22, 2008.  Prior to that response date, EPA Region III sent a letter to Potomac stating that its search resulted in no responsive information and that the request was being forwarded to the

---

[1] When a government agency claims a FOIA exemption and denies a citizen's request for government records, the agency must provide a detailed affidavit that "permit[s] the court system effectively and efficiently to evaluate the factual nature of disputed information." Vaughn v. Rosen, 484 F.2d 820, 826 (D.C.Cir.1973).  This is commonly referred to as a Vaughn index.

9

Office of Pollution Prevention and Toxics (OPPT).  On September 30, 2008, OPPT sent an email to Potomac stating that more time would be required and "[a]n initial determination is expected by October 21, 2008."  On October 22, 2008, OPPT provided by email some limited information confirming the presence of PCBs in regulated concentrations on board the HUDDELL.  The email also indicated that two redacted documents would be produced shortly.  On October 28, 2008, OPPT sent to Potomac four pages of documents from which eight sentences were redacted.  The letter accompanying the documents stated that they were redacted on the basis of "Privileged Intra-Agency Memoranda: deliberative process privilege, attorney work product."  EPA Mot., Ex. 3.

Potomac responded on October 28, 2008, that it was dissatisfied with EPA's response to the FOIA request.  On or about November 4, 2008, Potomac was advised that no additional searches would be conducted nor documents produced.  Potomac filed an administrative appeal of that decision and when no response was received within the time allowed by statute, Potomac filed the instant suit against the EPA.

With its Motion to Dismiss Because the Matter is Moot, EPA submitted the declaration of Gregory Snyder.  Snyder briefly recounts EPA's FOIA response thus far, and then announced that EPA was waiving its FOIA exemptions and releasing the 8 redacted sentences.  With the non-redacted versions of the documents, EPA

10

also forwarded two attachments to those documents that it asserts were "inadvertently" not provided with the initial disclosure.  On the basis of these limited disclosures, EPA argued that Potomac's action against it was now moot.

As it did in opposing MARAD's motion, Potomac highlights the unexplained absence of certain kinds of documents that one would reasonably have expected to have also been produced given what was produced.  Potomac noted the absence of any documents related to EPA meetings and communication with MARAD, meetings with staffers for the Rhode Island State Senator who was behind the transfer of the HUDDELL to Greece, and PCB testing.  Potomac also noted that the once-redacted, now-revealed sentences demonstrate that, despite the presence of PCBs on the HUDDELL, it appeared that the vessel was permitted to be exported without remediation or waiver, in clear violation of TSCA.

EPA replied to MARAD's motion with more affidavit testimony and, significantly, new documents.  In addition to resubmitting the identical declaration of Gregory Snyder, EPA offered the declaration of Alizabeth Olhasso, Acting Chief of Region III's Toxic Program Branch, Land Chemicals Division, and Maria Doa, Director of the National Program Chemicals Division (NCPD) of OPPT.  Olhasso declared that Kelly Bunker, the PCB Coordinator in the Toxic Program Branch at the time, searched the PCB files and found no responsive document and stated further that her

office played no role in evaluating the HUDDELL for PCB contamination.  Olhasso Decl. ¶¶ 3,4.  Doa related that the FOIA request was assigned to Peter Grimlin, the Environmental Protection Specialist at NPCD knowledgeable in the area of PCBs on ships and the HUDDELL in specific.  Doa Decl. ¶ 8.  She described the files searched by Grimlin, and noted that two responsive documents found were referred to their point of origin, the Office of Enforcement and Compliance for review and redaction.  Three other documents were found but not produced because they originated from MARAD and she considered EPA's responsibility to respond to the FOIA request as to those documents satisfied by the referral of the request to MARAD.  Doa Decl. ¶¶ 9, 10.[2]

In the last paragraph of her declaration, Doa relates that, at some time subsequent to the processing of the FOIA request, Grimlin received a copy of a letter from Kinley-Horn and Associates (KHA), dated October 5, 2008, stating that KHA had observed and documented the removal of PCBs from the HUDDELL while it was still moored in Norfolk.  This remediation took place between September 4, 2008 and October 1, 2008.  Attached to Doa's declaration is the two page letter from KHA.  It does not appear, however, that any of the attachments referenced in

---

[2] It is not clear from the record if these three documents were documents eventually produced by MARAD.

12

that letter detailing the remediation of the HUDDELL were provided.

In its opposition/surreply, Potomac highlights the ways in which EPA's piecemeal disclosures, like those of MARAD, simply raise more and more questions:

> "[W]ith respect to the initial production, why did EPA refuse to produce a Vaughn index to set forth the documents it knowingly withheld?"

Surreply at 7.

> "With respect to the second production, what caused the agency to change its position and disclose the documents that showed that EPA believed it had discretion to allow the export of PCBs in regulated quantities without requiring a waiver?"

Id.

> "With respect to the most recent production, where are the EPA documents that demonstrate the submission of a PCB remediation plan, the approval of such plan by EPA, and subsequent follow-up and oversight of the remediation?"

Id.

> "Why is it that only now – a year after the HUDDELL was allowed to go to Greece (and nearly a year after Potomac's FOIA request) – has the environmental consultant's letter been produced to Potomac (apparently without the referenced attached exhibits, which still have not been provided by EPA) saying that remediation was completed?"

Id.

> Why does the Doa Declaration "not indicate when Mr. Gimlin received this letter or even from whom it was received[?]"

13

Id. at 11.

> Why has EPA "failed to produce a detailed declaration from the most relevant EPA office, the Office of Enforcement and Compliance Assurance ("OECA") informing Plaintiff of the manner in which the search was conducted[?]"

Id. at 10.

> Why, in contrast to the Doa Declaration, does the "Olhasso Declaration fail[] to confirm that Ms. Bunker conducted any search of her electronic files[?]"

Id.

EPA responded to these questions with, for the most part, the same generic recitation of the legal standard and the repeated bald assertions that "EPA has conducted a reasonable search for records responsive to plaintiff's FOIA requests" Resp. to Surreply at 1, and [a]ll questions raised by Plaintiff[] as demonstrating issues of material fact have been answered by Defendant." Id. at 2. The only specific questions that elicited a response by EPA are the Vaughn index question and the question as to the late production of the KHA letter. As to the late production of the KHA letter, EPA's only response is the argument that "when an agency does subsequently locate additional documents, courts generally have accepted this as evidence of the agency's good-faith efforts." Id. at 7. That may well be true, but courts are also generally supplied with

some explanation as to why a document makes a late appearance, particularly a document of this significance.

There may well be perfectly reasonable answers to the questions posed to MARAD and EPA as to why there is this apparent dearth of documentation concerning PCBs on the HUDDELL. Defendants have chosen, however, for whatever reason, not to provide those answers.  This Court's familiarity with MARAD's and EPA's responses to a similar discovery of PCBs on another decommissioned vessel that was to be exported to Greece, see United States v. Potomac Navigation, Inc., Civ. No. WMN-08-717 (D. Md.), makes it difficult to believe that PCBs could be discovered on a vessel, be remediated consistent with the mandates of TSCA, and the vessel exported without leaving more of a paper trail than the thin record produced thus far by Defendants.

Accordingly, the Court finds that the issues raised in these actions are not moot and Defendants are not entitled to summary judgment.  Thus, the Court will deny these motions.[3]  The Court will also allow Potomac to take discovery in these actions.  In the case against MARAD, Potomac has asked for the opportunity to take depositions of knowledgeable persons, such as Ms. Gurland, Mr. Walker, Mr. Wagner, Ms. Junemann, and UL's

---

[3] The issue of attorney fees raised in Potomac's oppositions to the motions to dismiss is not ripe and will be addressed at a later stage in these proceedings.

Sampling Project Coordinator, Mr. Michael Jennings.  Surreply at 19.  In the case against the EPA, Potomac has asked for the opportunity to take depositions of "knowledgeable persons identified by EPA, like OECA's Joyce Olin, Branch Chief Lynn Vendinello, Environmental Specialist Peter Gimlin, PCB Coordinator Kelly Bunker, and KVA Remediation Manager Michael Iwashchenko."  Surreply at 12.  Recognizing that discovery in FOIA cases should be as limited as possible, it is hoped that the parties can reach some agreement as to a narrower scope of discovery without further involvement of the Court.  If they are unable to do so, the parties shall inform the Court by joint status report.

    A separate order will issue.

                        _____/s/_____
                        William M. Nickerson
                        Senior United States District Judge

DATED: December 15, 2009